NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 86

No. 2015-372

| | |
|---|---|
| In re Costco Stormwater Discharge Permit, Costco Final Plat & Site Plan, Costco Act 250 Land Use Permit, Wetlands Reclassification, et al. (R.L. Vallee, Inc. and Timberlake Associates LLP, Appellants) | Supreme Court On Appeal from Superior Court, Environmental Division March Term, 2016 |

Thomas S. Durkin, J.

Jon T. Anderson of Burak Anderson & Melloni, PLC and Alexander J. LaRosa of Murphy Sullivan Kronk, Burlington, for Appellant R.L. Vallee, Inc.

David L. Grayck of Law Office of David L. Grayck, Montpelier, for Appellant Timberlake Associates LLP.

Mark G. Hall of Paul Frank + Collins P.C., Burlington, for Appellee.

William H. Sorrell, Attorney General, and Justin Kolber and Elizabeth Tisher, Assistant Attorneys General, Montpelier, for Appellees Agency of Natural Resources and Natural Resources Board.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **ROBINSON, J.** This appeal is from a decision of the environmental division of the superior court affirming several permits issued to appellee Costco Wholesale Corporation for the expansion of its existing retail store and the addition of an adjacent six-pump gasoline station in the Town of Colchester. Appellants R.L. Vallee, Inc. and Timberlake Associates LLP own retail gasoline-service facilities located near the planned development. Appellant Vallee contends the trial court erroneously: (1) determined that Costco's proposed traffic-mitigation measures were sufficient for issuance of an Act 250 permit; (2) made findings concerning the impact of an

underground stormwater outlet pipe not addressed below, and with respect to which the court limited cross examination by Vallee's counsel; (3) concluded that the project would not adversely affect a Class 2 wetland for issuance of an individual wetland permit; and (4) excluded testimony and a related exhibit prepared by appellant Vallee's wetland consultant. Appellant Timberlake asserts that the trial court erred in relying on a presumption with respect to the project's impact on water pollution and waste disposal under Act 250. We affirm.

¶ 2. Costco owns property off Route 7 in the Town of Colchester, where it operates a members-only retail store. The Costco facility lies just north of the intersection of the junction of Route 7, or the Roosevelt Highway, and Interstate 89 at Exit 16. To facilitate plans to expand the store, reconfigure a portion of its parking lots, and add a gasoline sales facility, Costco applied for—and was granted—a number of local and state permits, including final plat and site plan approval from the Town of Colchester; a stormwater discharge permit from the Agency of Natural Resources (ANR); an Act 250 land use permit; and an individual wetlands permit from ANR. During the application and review process, appellant Timberlake successfully petitioned ANR to reclassify a Class 3 wetland located on the project site to a Class 2 wetland (the so-called "Lot 5 wetland"), thereby triggering a fifty-foot buffer requirement around the wetland. As a result of this change, Costo was required to get an individual wetland permit, which in turn required a ruling that the project would not adversely affect the wetland's identified functions and values. Vermont Wetland Rule § 9.5(a), 6 Code of Vt. Rules 12 004 056, available at http://www.lexisnexis.com/hottopics/codeofvtrules (Wetland Rules).

¶ 3. Appellants Vallee and Timberlake appealed all of the permit determinations to the environmental division. A number of the appeals were settled, and the rest—the final plat and site plan approval, stormwater discharge permit, wetland reclassification, individual wetland permit, and Act 250 permit—were the subject of a coordinated multiple-day trial. In August 2015, the court issued findings, conclusions, and a final judgment order affirming the remaining permits on

2

appeal. Appellants Vallee and Timberlake separately appealed.[1] We set forth relevant facts as they relate to the arguments on appeal.

¶ 4. "[B]ecause the trial court determines the credibility of witnesses and weighs the persuasive effect of evidence, this Court will not disturb [its] factual findings unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous." In re Route 103 Quarry, 2008 VT 88, ¶ 4, 184 Vt. 283, 958 A.2d 694 (quotation omitted). The trial court's findings "will not be disturbed merely because they are contradicted by substantial evidence; rather, [an appellant] must show that there is no credible evidence to support them." In re Miller Subdivision Final Plan, 2008 VT 74, ¶ 13, 184 Vt. 188, 955 A.2d 1200. "Although we review the environmental court's legal conclusions de novo, we will uphold those conclusions if they are reasonably supported by the findings." In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 21, ___ Vt. ___, 121 A.3d 630 (citation and quotation omitted).

¶ 5. We note, as well, that "we generally give substantial deference to an agency's interpretations of its own regulations"—in this case ANR's interpretation of the regulations governing the wetland and stormwater discharge permits at issue. In re ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶ 15, 196 Vt. 467, 98 A.3d 16. Appellants here "bear the burden of showing that ANR's interpretation is wholly irrational and unreasonable in relation to its intended purpose." Id. ¶ 17 (quotation omitted).

## I. Traffic Issues

¶ 6. Appellant Vallee first asserts that the evidence failed to support the trial court's finding that Costco's proposed near-term highway improvements were sufficient to mitigate the

---

[1] A number of appellants' claims involve issues pertaining directly or indirectly to more than one permit. Although not entirely clear, appellant Vallee's briefing suggests that its traffic claims relate to the Act 250 permit, and the remainder of its claims relate to Costco's individual wetland permit. Appellant Timberlake's claim concerns the Act 250 permit, although the underlying issues pertain to the presumptive effect of ANR's issuance of the stormwater discharge permit.

development's traffic impacts under Criterion 5 of Act 250. See 10 V.S.A. § 6086(a)(5)(A) (providing that Act 250 permit requires finding that development "[w]ill not cause unreasonable congestion or unsafe conditions with respect to use of the highways"). Vallee contends that, while long term improvements to the traffic flow at the I-89/Route 7 intersection may mitigate the traffic impacts of this project, the near-term improvements proposed by Costco are themselves insufficient to mitigate those impacts.

¶ 7. The trial court found that both Lower Mountain View Drive and Hercules Drive provide access to Costco from Route 7. Lower Mountain View Drive intersects Route 7 about 100 yards north of the junction with I-89 and generally provides the greater flow of traffic into and out of the Costco development. Hercules Drive intersects with Route 7 farther north and provides better access to Costco visitors who are coming from or traveling to locations north of the I-89/Route 7 junction.

¶ 8. During the afternoon weekday rush hour, traffic is particularly congested on Route 7 at the I-89 interchange, and will sometimes back up to the intersection with Lower Mountain View Drive. The congestion has led the Vermont Agency of Transportation (VTrans) to propose improvements to the I-89/Route 7 Exit 16 junction, including a signalized interchange known as a Double Crossover Diamond. VTrans is pursuing permits for these improvements. The improvements will be funded through several sources, including area businesses such as Costco. However, the timeframe for its completion is uncertain and could run to ten years or more.

¶ 9. The trial court further found that the proposed Costco development would likely cause 155 new vehicle trips during peak traffic hours. Most but not all of this new traffic will exit Costco via Lower Mountain View Drive, turning left onto Route 7, toward the I-89 interchange. To mitigate the impact of the additional traffic—which the court found to be "measurable, but not substantial"—Costco proposed to construct certain near-term improvements to the Route 7/Lower Mountain View Drive intersection, including the addition of a second dedicated left-hand turn lane

4

from Lower Mountain View Drive onto southbound Route 7, a second dedicated right-hand turn lane for vehicles turning right from Lower Mountain View Drive onto northbound Route 7, and another travel lane for through traffic and traffic turning right onto Route 7 from Lower Mountain View Drive. In addition, Costco has proposed better synchronization of traffic lights at all area intersections "to allow for more optimal traffic flow," and a "Do Not Block Driveway" sign at the curb cut for Vallee's facility. The court found that these improvements would "fully mitigate the additional traffic that the proposed Costco [development] will generate," and thus determined that the development complied with Criterion 5.

¶ 10.    Vallee maintains that there was "no evidence" to support the trial court's finding that Costco's proposed near-term improvements to the Lower Mountain View Drive intersection, without reconfiguration of the I-89 interchange, were sufficient to mitigate the project's full traffic impacts. Vallee contends that the expert simulations relied upon by Costco assumed the completion of the reconfiguration of the I-89 interchange, and that reconfiguration was essential to mitigate the project-generated traffic. Vallee argues that the improvements to the Route 7/Lower Mountain View Drive intersection are inadequate to mitigate the effects of the additional traffic at the I-89/Route 7 interchange, and that they do nothing more than increase "storage capacity" for cars to wait in traffic at Lower Mountain View Drive and Exit 16. For these reasons, Vallee argues the trial court erred in refusing to condition approval of the Act 250 permit upon completion of the I-89 interchange improvements.

¶ 11.    As noted, before granting an Act 250 permit, a district commission or court must find that a project "[w]ill not cause unreasonable congestion or unsafe conditions with respect to use of the highways." 10 V.S.A. § 6086(a)(5)(A). The burden of proof in this regard "shall be on any party opposing the applicant." Id. §6088(b). The applicant nevertheless bears the burden of production to establish at least a "prima facie case" of compliance. In re Champlain Parkway Act 250 Permit, 2015 VT 105, ¶ 15, ___ Vt. ___, 129 A.3d 670. While a court or district commission

5

may not deny an application "solely for the reasons set forth" in Criterion 5, it may impose "reasonable conditions and requirements" consistent with the police power to "alleviate the burdens created" by the project. 10 V.S.A. § 6087(b); see also id. § 6086(c) ("A permit may contain such requirements and conditions as are allowable proper exercise of the police power.").

¶ 12. Viewed in the light of these standards, we conclude the record evidence here was sufficient to support the trial court's findings and conclusions under Criterion 5. With respect to the impact of the additional traffic at the I-89 interchange, Costco's traffic expert testified that the estimated 155 additional peak-hour trips generated by the project represented "a very small percentage of the overall daily [vehicular] traffic" in the area, which numbered in thousands along the busy Route 7 corridor adjacent to Costco; that this figure was less than the daily fluctuations in traffic volume at those intersections, and thus "small enough" to be considered by traffic engineers as "insignificant"; and that, from a traffic-engineering perspective, the project would have no "significant or measurable effect on . . . future safety trends at the intersection."

¶ 13. With respect to the Lower Mountain View Drive/Route 7 intersection, Costco's expert testified that the proposed near-term improvements would mitigate the additional traffic generated by the project, even without the I-89 interchange modification. These improvements, as noted, included the addition of turning lanes, signal-timing modifications, and additional signage. The expert testified that these changes would provide "additional capacity at the [Mountain View Drive] intersection" and "improve[] queuing conditions." Although that expert testified that modifying the I-89 interchange to a double diamond configuration would "have the greatest overall benefit to traffic operations throughout the study area," when asked whether the near-term improvements would "mitigate completely the additional traffic resulting from the Costco project" even ignoring the anticipated reconfiguration of the I-89 interchange, the expert stated categorically that "they will."

6

¶ 14.    In its findings and conclusions relating to Criterion 5, the trial court relied on the report and testimony of Costco's traffic expert, having found that she "presented the most credible explanation and examination of the current traffic challenges, how the proposed Costco improvements will impact on existing and future traffic, and to what extent the proposed mitigation steps will alleviate overall traffic concerns." This was a judgment well within the trial court's broad discretion to assess the credibility of the witnesses and the persuasive value of the evidence. In re Entergy Nuclear Vt. Yankee Discharge Permit, 2009 VT 124, ¶ 15, 187 Vt. 142, 989 A.2d 863. Thus, we conclude that the evidence here was sufficient to support the trial court's conclusion that the proposed near-term improvements to the Mountain View Drive intersection "will fully mitigate the adverse traffic impacts caused by" the Costco project, and that, thus mitigated, the project impacts did not "warrant . . . conditioning the [project] . . . on the completion" of the planned I-89 improvements.

¶ 15.    Vallee's principal objection to the court's ruling focuses on the conclusion shared by all of the experts, Costco's included, that any meaningful alleviation of traffic congestion along the Route 7 corridor would require a modification of the I-89 interchange. Vallee asserts, in this regard that "improved storage does not negate . . . congestion." The issue, however, was not whether the near-term improvements would alleviate the already-existing congestion in the area, but whether they would mitigate the relatively small impacts generated by the project, and the Costco traffic expert's opinion—as noted—was clear in this regard.

¶ 16.    For the same reason, Vallee's claim that the trial court misapplied our decision in In re Pilgrim Partnership, 153 Vt. 594, 572 A.2d 909 (1990), is wide of the mark. In Pilgrim Partnership we held that Criterion 5 "does not require that [a] proposed [project] be the principal cause or original source of traffic problems" in order to support the imposition of reasonable conditions to alleviate any additional burdens created; it is sufficient if the project "would contribute to the existing traffic problem." Id. at 596, 572 A.2d at 910. In that case, we affirmed

a determination by the environmental board that a project that led to a 5% increase in traffic on a narrow, curved road that already had a dangerous level of traffic would contribute to the congestion problem.

¶ 17. Our decision in Pilgrim Partnership did not establish that in every case, an increase of 5% in an already congested area is sufficiently substantial to require mitigation; rather, we affirmed the reasonableness of the environmental board's determination that in that case it was. Here, the trial court expressly recognized and properly applied Pilgrim Partnership by conditioning approval of the Act 250 permit on the construction of those near-term improvements that it found to be necessary—and sufficient—to mitigate the project's contribution to the existing congestion in the area. Accordingly, we conclude that the trial court finding of compliance with Act 250's Criterion 5 was supported.

## II. The Underground Pipe

¶ 18. Vallee asserts that the court erred in approving the wetland permit with an underground pipe not considered by ANR, and denied Vallee the opportunity to present evidence concerning that pipe. The background to these claims is as follows.

¶ 19. The permitting process for the Costco development spanned a number of years and required the review and approval of several agencies. In May 2012, Costco obtained a stormwater discharge permit from ANR to revise and upgrade the stormwater treatment and discharge system at the site. In July 2012, the Colchester Development Review Board granted final plat and site plan approval. In January 2013, the district commission approved Costco's Act 250 permit application; the commission noted that the ANR stormwater permit created a rebuttable presumption of compliance with Criterion 1(B) regarding waste disposal, and concluded that Vallee had not adduced evidence sufficient to rebut the presumption. In September 2013, ANR granted Timberlake's petition to reclassify the wetland located on the project site from Class 3 to Class 2, the effect of which was to prohibit any further development in the wetland or its associated

buffer zone absent specific approval. 10 V.S.A. § 913(a). Finally, in March 2014, ANR issued an individual wetland permit, authorizing Costco to build and operate a portion of the project, consisting of gas pumps and a parking lot, as well as upgrades to the existing stormwater system, within the buffer zone.

¶ 20. The revised stormwater discharge system is designed to route a substantial portion of the stormwater runoff from the Costco site through a series of improved "detention ponds" and several new "pre-treatment structures" to remove oil, sediment, and grit, and ultimately pass the treated stormwater through an underground pipe to discharge through a new outlet structure near an existing culvert into Sunnyside Brook. The proposed underground pipe and outlet are partly located within a portion of the reclassified Lot 5 wetlands buffer. The pipe is to be installed by a process of "underground directional drilling."

¶ 21. Given that ANR had not considered this pipe in approving Costco's wetland permit application, Vallee argued below that the environmental division was obligated to remand the permit to ANR so that ANR could consider it in the first instance.

¶ 22. The court declined to do so, finding that installation of the pipe and outlet structure—located adjacent to a "pre-existing culvert that already transports stormwater to Sunnyside Brook"—would have "no impact upon the surrounding land, the wetland, its buffer, or Sunnyside Brook." The court further noted, and appellant does not dispute, that "it appears that the details of this pipe and outlet structure" were delineated in 2008 and reflected in Costco's "Stormwater Details Site Plan" admitted as a Costco exhibit at trial. The court acknowledged that ANR did not consider the underground pipe and outlet structure in awarding the wetland permit, but offered a likely explanation. When Costco first filed its wetlands permit application the reclassification which resulted in the creation of a protected wetland buffer zone had not yet occurred; thus, the court concluded that the underground pipe and outlet were disclosed but may have been overlooked "because at that time, no wetland buffer had been delineated." As the court

9

explained, the "pipe and [outlet] structure were disclosed by Costco but simply didn't raise enough concern for ANR and other parties during the wetland permit proceeding."

¶ 23. The lack of administrative review notwithstanding, "the credible evidence showed," the court found, "that this underground pipe and outlet structure will have no more than minimal impacts, if any, on the protected wetland buffer and will not impact individuals not already parties to these proceedings and are not, therefore, so material as to warrant a remand for a wholly new review and notice publication by ANR."

¶ 24. Vallee asserts that the court's ruling was erroneous because the court lacked "jurisdiction" to address the matter, and improperly prohibited cross-examination of Costco's expert on the issue. The claims are unpersuasive. We have held that the environmental court is not required to remand a project to an administrative agency for additional review where later revisions are relatively "insubstantial" and do not "affect new parties not participating in the proceedings." In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶¶ 102, 109. The trial court here recognized and applied this principle in determining that a remand to ANR was unnecessary because the evidence showed that the impacts from the pipe and outlet structure to the wetlands and surrounding buffer would be minimal, and would not affect any parties not before the court. Vallee has adduced no evidence or argument to show that the court's decision in this regard was an abuse of discretion. See id. ¶ 99 (noting that "[o]ur standard of review for the environmental court's decision to remand a permit application is abuse of discretion").

¶ 25. Vallee's objection that the court lacked jurisdiction because Costco did not expressly "request" that the permit be amended to include the pipe and outlet structure is unsupported; even in the absence of a specific request, the trial court had ample authority to approve the permit with revisions reflecting the pipe—if they were revisions at all—where it concluded that it did not detrimentally affect the environmental review criteria or unrepresented parties.

¶ 26. Equally unsupported is the assertion that the court improperly prevented Vallee from presenting evidence concerning the pipe and outlet. Vallee bases this claim on the court's ruling sustaining an objection to a single question to a Costco expert. The record shows that appellant cross-examined the witness specifically about the underground pipe and outlet. The expert testified that the installation of the pipe through a process of "directional drilling" would have no negative impact on the wetland or wetland buffer. When asked whether Costco's permit application had considered any "improvements" to be installed around the proposed outlet, the court sustained an objection based on the witness's earlier testimony that she had no knowledge of any planned structure or improvements. The court explained that on the basis of the record as it then stood, there was no foundation in the record for questions about the structure. Vallee has not shown that the court either abused its discretion or violated Vallee's due process rights in so ruling. See Gilman v. Towmotor Corp., 160 Vt. 116, 123, 621 A.2d 1260, 1264 (1993) ("The extent to which a party may cross-examine a witness is within the sound discretion of the court.").

### III. Impact on Class 2 Wetland

¶ 27. Vallee also challenges the trial court's conclusion that the project will not have an undue adverse impact on the functions and values of the wetland justifying its designation as a protected wetland, and argues that the court failed to consider cumulative impacts on the Lot 5 wetland. By way of background, Costco's current stormwater treatment system was installed in 1993 when the Costco facility was first constructed. The system relies in large part on the use of stormwater detention ponds, a filter strip, ditches, and grassed areas in or near the wetland to remove contaminants. The court found that the current system fails to adequately collect and treat stormwater from the Costco site before it flows into the Lot 5 wetland and Sunnyside Brook, and does not comply with current Vermont Stormwater Management Rules. The new system would improve the existing detention ponds to store more stormwater for longer periods, and replace the overland flows over grass filters with a series of channels and treatment tanks and an underground

11

pipe terminating at Sunnyside Brook. The court found that the new system would decrease the direct flow of stormwater—much of it containing contaminants—into the Class 2 wetland on Lot 5.

¶ 28. At trial, Vallee argued that by diverting stormwater that currently flows directly into the wetland to other treatment areas, the new system would actually harm the wetland by reducing its water level. The court found that no credible evidence supported the claim, and that Costco's and ANR's experts had offered credible evidence to refute it. The court also found no credible evidence to support Vallee's claim that the new treatment system would adversely reduce the groundwater in the area. Thus, the court concluded that the new system would not impair, and, in fact, would improve, the wetland's ability to perform the functions identified by ANR.

¶ 29. On appeal, Vallee contends that Costco's "analysis" failed to address the "loss in wetlands functionality" resulting from the diversion of stormwater under the new system. The claim essentially is that the evidence did not support the trial court's findings that the new system would not adversely affect the wetland's functions.

¶ 30. The record shows otherwise. Costco's wetland consultant testified that the diversion of untreated stormwater from the wetland represented an "enhancement" of its quality, a "net benefit because there won't be pollutants going into the wetland anymore," and further testified that she could not identify "any [adverse] impacts" to wetland functions from the new stormwater system. The same witness explained that runoff from the Costco site was not fundamentally "supporting that wetland . . . it's supported by a combination of groundwater and surface water, [and] having the Costco [water] go somewhere else is better than using the wetland as the treatment for that water." A wetland ecologist with ANR similarly testified that the diversion of largely untreated stormwater would not affect the wetland's quality or functions, that it would continue to receive and store water from other sources, including stormwater run-off from roadways and other properties, as well as "precipitation and groundwater," and that the new system

would not "alter the physical and vegetative characteristics of the wetland" to the detriment of its functions. This evidence was more than adequate to support the court's finding that the project and new stormwater system would not adversely affect the Lot 5 wetland.

¶ 31. Vallee asserts, nevertheless, that Costco's evidence was deficient in failing to "compare the quality and quantity of Costco's stormwater" entering Sunnyside Brook under the current and proposed treatment systems, and asserts that the new system will result in a net loss in water quality and undermine the wetland's downstream erosion-protection function. The claim is unsupported. The record here discloses that environmental analysts for ANR testified that the existing Costco stormwater system's heavy reliance on the wetland itself and an imbedded "filter strip" to cleanse stormwater of contaminants does not meet current stormwater treatment standards. ANR's stormwater-system analyst testified further that Costco's proposed new system did meet current treatment standards—specifically for purposes of ensuring adequate water quality, groundwater recharge, flood protection, and channel protection. Costco introduced substantial testimony by environmental analysts that the new system's expanded stormwater-storage facilities and outlet structures designed to control the volume and flow-rate of water released through the system would enhance water quality in the wetland, provide additional downstream channel and erosion protection, and improve the quality of water flowing to Sunnyside Brook. This was sufficient to support the court's finding that the project would not adversely affect the wetland's core functions and values. No more was required.

¶ 32. Vallee additionally contends that the trial court improperly failed to consider "cumulative impacts" in determining that the project would have only a "minimal" impact—if any—on the Lot 5 wetland, and therefore improperly failed to require "mitigation sequencing." See Wetland Rule § 9.5 (in determining whether proposed activity will have "other than a minimal impact" on wetland's "protected functions and values," activity must be evaluated on basis of

13

immediate as well "any cumulative ongoing effects" and any undue adverse impact must be addressed by "mitigation sequencing").

¶ 33. We disagree. ANR's wetland ecologist testified expressly that the State had determined that the Costco project would have no "more than a minimal impact to the functions and values of the [Lot 5] wetland," and confirmed that the State had "consider[ed] cumulative impacts" in its review of the permit application. The witness explained that the State was specifically aware of, and had considered, the ongoing impact of the existing development that "essentially bounds [the wetland] on all sides," including roads, other commercial developments, and the Costco facility. Thus, the record supports the trial court's finding that the project would have no more than a minimal effect on the wetland's ability to serve its core functions. Vallee's assertion that, in reaching this conclusion, the court incorrectly compared the project's preexisting and anticipated impacts on the wetland rather than its anticipated impacts "in addition" to the prior impacts, finds no credible support in the record.

IV. Restriction of Vallee's Expert Testimony

¶ 34. Finally, Vallee argues that the trial court erroneously excluded an exhibit prepared by its stormwater-management consultant and related testimony designed to demonstrate that Costco's existing stormwater-treatment system is superior to the proposed system for removing stormwater contaminants and reducing downstream erosion.

¶ 35. In an earlier ruling, the court had excluded as unreliable the same expert's testimony concerning the results of a stormwater analysis using a computer software program known as WinSLAMM (Source Loading and Management Model). Based on extensive testimony from a number of environmental analysts, the court found that the WinSLAMM computer model was not designed to "accurately predict stormwater infiltration rates within a wetland" and that appellant had not shown "comparable use" of the model within Vermont or elsewhere. Thus, the

court concluded that the testimony was "unreliable and insufficient under the U.S. Supreme Court's standard in Daubert." See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589-92 (1993) (establishing test for admissibility of expert testimony based on showing that scientific evidence is relevant and reliable); USGen New England, Inc. v. Town of Rockingham, 2004 VT 9, ¶¶ 18-19, 177 Vt. 193, 862 A.2d 269 (noting that Vermont has adopted "admissibility principles" of Daubert for expert evidence, and that courts must "act as gatekeepers who screen expert testimony ensuring that it is reliable and helpful to the issue at hand"); V.R.E. 702 (essentially codifying Daubert guidelines for reliability of expert testimony). Vallee has not challenged that ruling.

¶ 36. The same expert later testified extensively on his supplemental analysis of the current and proposed stormwater systems, an analysis modified—according to appellant—to conform to the court's earlier ruling. Overruling an objection by Costco, the court ruled that it would admit the expert's testimony and "afford it the appropriate weight." The witness subsequently testified to his view that Costco's proposed system would increase the volume of stormwater entering Sunnyside Brook, resulting in more erosion and contaminants. He explained that this would result from diverting runoff so that it enters the brook as "stormwater flow" rather than absorbing or "infiltrating" it under the current system so that it enters as groundwater "base flow." The expert also described the "inputs" to the software model that he had utilized to derive a quantitative comparison of runoff and contaminants entering Sunnyside Brook under the proposed and existing systems, shown in appellant's Exhibit 126. These included an average measure of the existing system's filter strip, an average measure of the slope of the existing grass swale, an average "infiltration rate" for the soil in the area, an average "precipitation record" based on total precipitation from the year 1999 at the Burlington Airport, and an input designed to calibrate "east coast conditions" for average "amounts of pollution generated from . . . surfaces."

15

¶ 37. The trial court ultimately excluded Exhibit 126 based on concerns about the reliability of the computer-model inputs and whether they accurately reflected actual on-the-ground conditions. The court cited in particular the use of an average rather than specific measures accurately reflecting the variability of the existing filter strip, contradictory testimony from other witnesses about the efficacy "of the 20-year-old filter strip," an underestimation of the efficiency of the new system, and the use of only one specific year of rainfall as a guide. The court concluded that, "in essence," the exhibit's probative value was substantially outweighed by its prejudicial effect.

¶ 38. Vallee contends that the court's reliance on Vermont Rule of Evidence 403[2] in a bench trial was improper, and that its concerns about the exhibit were unfounded. Although some courts have questioned the usefulness of excluding evidence on the basis of "unfair prejudice" in a bench trial, see, e.g., Gulf States Utils. Co. v. Ecodyne Corp., 635 F.2d 517, 519 (5th Cir. 1981), this Court has not considered the issue, and we need not do so here. While citing Rule 403, the trial court's analysis showed that it was effectively finding the methodology underlying the exhibit to be unreliable, an exercise committed to the sound discretion of the trial court whether in a bench or a jury trial. See USGen New England , 2004 VT 90, ¶ 25 (noting that, although courts have recognized that their "gatekeeping role is less critical" when trial court sits as factfinder, none have abandoned "the requirement that the judge find the expert's testimony relevant and reliable").

¶ 39. As for Vallee's claim that the court's ruling was unfounded, we have explained that Daubert issues "depend[] heavily on the record . . . and the credibility of the expert witness," and thus are subject to review solely for abuse of discretion. Id. ¶ 22. When reviewing a court's decision in this regard, we must determine whether it was "made for reasons clearly untenable,"

---

[2] V.R.E. 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

and absent a "clear showing of . . . error . . . we will affirm the trial court's decision." Id. ¶ 24. The evidence supported the court's findings concerning the lack of connection between the average measures utilized in the expert's computer model and the actual age, functioning, and variability of the filter strip in Costco's existing system. Moreover, and perhaps more significantly, the record here shows that the expert provided lengthy and detailed testimony and supporting exhibits to advance his opinion concerning the superior capacity of Costco's existing stormwater system to prevent pollution and erosion in Sunnyside Brook. Thus, we are not persuaded that the court's exclusion of the exhibit in question—even if erroneous—was substantially prejudicial to appellant's case. See In re Eastview at Middlebury, Inc., 2009 VT 98, ¶ 22, 187 Vt. 208, 992 A.2d 1014 (observing that appellant had failed to show how, in light of admission of expert's report, exclusion of portion of his testimony "prejudiced her in this bench trial"); V.R.C.P. 61 (courts must disregard any error or defect in proceeding "which does not affect the substantial rights of the parties").[3]

## V.  Water Pollution and Waste Disposal Criteria

¶ 40.    Appellant Timberlake's sole claim is that the evidence failed to support the trial court's conclusion that the project met the Act 250 criteria for water pollution and waste disposal. See 10 V.S.A. §§ 6086(a)(1) (requiring that development "[w]ill not result in undue water . . . pollution") & 6086(a)(1)(B) (requiring that applicant demonstrate project will meet applicable environmental regulations "regarding the disposal of wastes" and not inject "waste materials or any harmful or toxic substances into ground water or wells").

¶ 41.    Timberlake acknowledges that Costco's stormwater discharge permit from ANR established a presumption of compliance with these statutory requirements. See 10 V.S.A.

---

[3]  In light of our decision, we need not address Costco's additional argument that the evidence was essentially irrelevant because compliance with the Vermont Stormwater Management Rules does not require a comparison of performance between a proposed and preexisting system.

17

§ 6086(d) (providing that Natural Resources Board "may by rule allow the acceptance of a permit or permits or approval of any State agency with respect to subdivisions (a)1) through (5) of this section . . . in lieu of evidence by the applicant" and that "acceptance of such . . . permit . . . shall create a presumption that the application is not detrimental to the public health and welfare with respect to the specific requirement for which it is accepted"); Environmental Bd. Rule 19(E)(1) (providing that ANR permit creates presumption that wastewater can be disposed of through treatment system "without resulting in undue water pollution").

¶ 42.    The presumption of compliance may, nevertheless, be challenged and rebutted by "any party," who "shall state the reasons therefor and offer evidence at a hearing to support its challenge."  Environmental Bd. Rule 19(F); see also In re Hawk Mountain Corp., 149 Vt. 179, 182, 542 A.2d 261, 263 (1988) (noting that certificate of compliance from Agency of Environmental Conservation "created a rebuttable presumption that the [proposal] . . . complie[d] with regulations governing the land application of waste disposal").  "Upon the rebuttal of the presumption, the applicant shall have the burden of proof under the relevant criteria and the permit . . . shall serve only as evidence of compliance."  Environmental Bd. Rule 19(F).

¶ 43.    Timberlake maintains that it effectively rebutted the presumption arising from Costco's stormwater permit through cross-examination of ANR's stormwater compliance analyst. The witness had testified on direct examination that the stormwater discharge permit was issued based on ANR's determination that Costco's proposed treatment system met the current design specifications in the Vermont Stormwater Management Manual for all necessary criteria, including removal of eighty percent of the total suspended solids and forty percent of total phosphorus.  On cross-examination, the witness underscored that "compliance with the stormwater management manual is designed for the express purpose of achieving the water quality standards."  She explained that the design standards in the manual were based on standards established by the Center for Watershed Protection, a national nonprofit organization that studies and develops

18

stormwater and watershed management practices. The official acknowledged that, apart from maintenance inspections, ANR does not routinely monitor systems deemed in compliance with the standards to test their performance, and had not run any specific tests on Costco's system.

¶ 44. Timberlake asserts that it effectively rebutted the presumption arising from the stormwater permit by demonstrating that "the real fact of no undue water pollution under Criterion 1, and no injection of waste materials under Criterion 1(B), is not as presumed by the trial court."

¶ 45. The argument is unpersuasive. The statute and rule contemplate that a party may adduce evidence to show that a project will not comply with the relevant Act 250 criteria notwithstanding an agency permit. See, e.g., Hawk Mountain Corp., 149 Vt. at 186, 542 A.2d at 265 (holding that town's expert testimony that proposed sewage system "did not comply with several of the health regulations . . . including standards for distances between leach field, for emergency replacement areas and for manhole distribution" was sufficient to rebut presumption). Timberlake here adduced only an acknowledgment that ANR had relied on design standards for stormwater treatment systems established by a national stormwater-management research and development organization rather than performance-testing the systems itself. The decision to use the chosen design standards is well within ANR's discretion. See 10 V.S.A. § 6086(d) (providing that "[i]n the case of approvals and permits issued by the Agency of Natural Resources, technical determinations of the Agency shall be accorded substantial deference"); In re ANR Permits, 2014 VT 50, ¶ 15 (we give "substantial deference" to ANR's interpretation of its own regulations). Here, rather than producing affirmative evidence to rebut the presumption, Timberlake merely elicited evidence that the expected performance impact of ANR's design standards had not been validated by local field tests. Evidence that the design standards have not been proven to yield the expected performance outcomes is not the same thing as evidence that the design standards do not in fact yield those outcomes, and Timberlake's cross-examination is not enough to burst the presumption and shift the burden of proof back to Costco.

19

¶ 46.    For the above reasons, we reject Vallee's and Timberlake's claims on appeal, and affirm the environmental division's judgment.

Affirmed.

FOR THE COURT:

Associate Justice